**INSTANT AIR FREIGHT CO., a corporation of the State of New Jersey**

v.

**C.F. AIR FREIGHT, INC., a corporation of the State of Delaware, Emery Air Freight Corporation, a corporation of the State of Delaware.**

**Appeal of C.F. AIR FREIGHT, INC.**

No. 89–5337.

United States Court of Appeals, Third Circuit.

Argued June 28, 1989.

Decided Aug. 17, 1989.

Richard E. Brennan (argued), A. Dennis Terrell, Shanley & Fisher, P.C., Morristown, N.J., for appellant.

Irwin I. Kimmelman (argued), Paul M. Colwell, Joseph Monaghan, Kimmelman, Wolff & Samson, Roseland, N.J., for appellee.

Before MANSMANN, SCIRICA and SEITZ, Circuit Judges.

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

We here examine a preliminary injunction which restrained C.F. Air Freight, Inc. ("C.F.") from terminating its air freight handling contract with Instant Air Freight Company ("Instant"). Because our independent examination of the record reveals that Instant has not established the irreparable injury necessary for the issuance of a preliminary injunction and because the bond requirement of the Federal Rules of Civil Procedure 65(c) has not been met, we will reverse and remand with instructions to vacate the preliminary injunction.

### I.

Instant, a New Jersey corporation, was formed in 1971 and since that date has provided air freight handling services to C.F., a Delaware corporation. The most recent contract between the two parties, entered into on March 2, 1987, covers a four-year period ending March 2, 1991.

On April 7, 1989, C.F. merged with Emery Air Freight Corp. ("Emery"), a Delaware corporation.[1] By letter dated April 11, 1989, C.F. notified Instant that effective April 17, 1989, C.F. would be closing their Elizabeth, New Jersey terminal through which the freight handled by Instant had been routed. C.F. offered, pursuant to paragraph EIGHTH of their contract, to pay Instant the sum of $220,000 in liquidated damages.[2]

On April 14, 1989, Instant filed a complaint seeking injunctive relief. On that same day Judge Murray G. Simon of the New Jersey Superior Court entered an order temporarily enjoining C.F. from terminating the agreement with Instant and from "utilizing the services of any person or entity other than plaintiff in contravention of the aforesaid agreement." On April 17, 1989, the Superior Court of New Jersey, Judge Harry A. Margolis, found C.F. in violation of the temporary restraining order and entered an order in aid of litigant's rights. On April 18 C.F. removed the case to the United States District Court for the District of New Jersey, citing diversity of citizenship of the parties. On April 20, 1989, after hearing oral arguments on the respective applications of the parties, the district court granted Instant's request to convert the state court temporary restraining order into a preliminary injunction. The court also imposed sanctions and fees against C.F. for its continuing violation of the two prior state court orders.

The district court initially found that Instant was likely to succeed on the merits and also determined that Instant would suffer irreparable harm if the agreement was terminated. Since eighty percent of Instant's business is devoted to servicing C.F., Instant "will lose the main portion of its business, many if not all of its employ-

---

1. Both Emery and C.F. have been named as defendants. We refer to the defendants collectively as "C.F.", throughout this opinion.

2. Paragraph EIGHTH of the contract between Instant and C.F. provides that:

In the event the Carrier [C.F.] shall close the terminal from which the Contractor [Instant] is operating and providing services for the Carrier, which results in termination of the within Agreement as at the time of such closing, then, in that event, the Carrier shall pay to the Contractor the following: if the terminal closes in the first or second year, the sum of $280,000; If the terminal closes in the third year, the sum of $220,000; if the terminal closes in the fourth year, the sum of $170,000. Said sum shall be paid to the Contractor by the Carrier in twelve equal monthly installments commencing on the first day of the first month following the closing of the terminal.

ees, and its goodwill and reputation in the industry. Without an uninterrupted continuance of the agreement, the business undoubtedly will be forced to shutdown or significantly curtail its operation."

The district court rejected C.F.'s contention that Instant's losses would be compensable by money damages. "The long term relationship between the parties, the justifiable reliance by plaintiff on the continuance of that business, its historical availability to serve the defendant over all of these years and the priority given to defendant's business, and the difficulty in valuing the goodwill and, in particular, the right of first refusal under the agreement, make money damages an inadequate remedy." The court found that in balancing the harm which would be suffered by Instant against the harm that a preliminary injunction would cause to C.F. the balance favored the issuance of a preliminary injunction since the adverse effects on C.F. had "been brought about by the voluntary action of the defendant." [3]

With regard to the bond requirement under Fed.R.Civ.P. 65(c) the district court denied C.F.'s request for a bond and adopted Instant's proposal that C.F. retain the $220,000 in damages which C.F. acknowledged it owed to Instant.

The district court stated:

What I will do is deny the bond now without prejudice. If you can establish that you are actually sustaining damages, you can come back and you will have some numbers, actual expense, and then if you can satisfy me that your potential losses exceed what is being

withheld under the contract, then at that time, we will all know much more about what is happening in the real world and I will certainly reconsider. So I will deny the application for the bond without prejudice, with the understanding that you will have the opportunity to satisfy me that your potential damages exceed the amount that you will be holding now as security.

The court further stated that "in my mind it would take some period of time to use up the $220,000."

Since this is an appeal of a preliminary injunction issued by the district court, we have jurisdiction pursuant to 28 U.S.C. § 1292(a).

In reviewing the district court's grant or denial of a preliminary injunction, we must determine whether the court abused its discretion, committed error in applying the law, or made a clear mistake in considering the proof. *Frank's GMC Truck Center, Inc. v. G.M.C.*, 847 F.2d 100, 101 (3d Cir. 1988).

■ We utilize a federal standard in examining requests to federal courts for preliminary injunctions. As we stated in *Systems Operations, Inc. v. Scientific Games Dev. Corp.*, 555 F.2d 1131 (3d Cir.1977), "[a]lthough the right upon which this cause of action is based is state-created, Rule 65(a) of the Federal Rules of Civil Procedure contemplates a federal standard as governing requests addressed to federal courts for preliminary injunctions." [4] *Id.* at 1141.

---

**3.** C.F. claims that upon its merger with Emery "almost all of the old C.F. terminals were closed and all freight is programmed through Emery's computer system," and that it is "not economically or physically possible to separate out the old C.F. business, new C.F. business, old Emery Business." Furthermore according to C.F. "there are now contracts in place with unions and other delivery firms."

**4.** As one authority has commented:
[I]n a diversity action involving a request for permanent injunctive relief, it seems clear that plaintiff should be able to obtain a temporary restraining order or a preliminary injunction to preserve the status quo even

though he is suing to enforce a state right and those devices are not provided for by the forum's law or are available only upon a different showing than is required under Rule 65....
[A]llowing a party temporary relief under Rule 65(a) and Rule 65(b) even though it would *not* be available under state law seems consistent with the Supreme Court's decision in *Hanna v. Plumer.* In that case the Court held that when a federal rule actually speaks to a particular point of practice or pleading it governs in a diversity action even if resort to state law would lead to a different result.
Although the federal rule on injunctions does not expressly provide any standards of availability, it does purport to uphold the his-

## II.

We have often recognized that the grant of injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances." *Frank's GMC*, 847 F.2d at 102 (citation omitted).

In order to obtain a preliminary injunction we have repeatedly held that the moving party must demonstrate:

(1) the reasonable probability of eventual success in the litigation and (2) that the movent will be irreparably injured *pendente lite* if relief is not granted. Moreover, while the burden rests upon the moving party to make these two requisite showing, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest."

*In Re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1143 (3d Cir.1982)

toric federal judicial discretion to preserve the situation pending the outcome of a case lodged in the court. Thus the Rule may be read as a codification of the traditional federal equity practice and although the standards are not articulated, there is enough detail in Rule 65 to make it clear that it embodies an important federal policy....

[T]here can be little doubt that [Rule 65(a) and (b) ] are procedural in nature. Since they deal solely with the means by which a party can obtain the limited relief afforded by a preliminary injunction or a temporary restraining order, they merely provide procedures by which the federal courts effectively can adjudicate and process the cases brought before them. Thus the federal rule should control as against a contrary state practice....

11 C. Wright and A. Miller, *Federal Practice and Procedure*, § 2943 (1973) (footnote omitted). *Cf. Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). In any case, federal and New Jersey standards for the granting of preliminary injunctions are essentially the same and would lead to the same result in this case. *See infra* footnote 7.

**5.** The irreparable injury requirement has been questioned by a number of scholars. *See e.g.,* Hammond, *Interlocutory Injunctions; Time for a New Model*, 30 U. Toronto L.J. 240 (1980); Rendleman, *The Inadequate Remedy at Law Prerequisite for an Injunction*, 33 U.Fla.L.Rev. 346 (1981); Laycock, *Injunctions and the Irreparable*

(citations omitted). Thus, irreparable injury must be present for a preliminary injunction to issue. "[A] failure to show a likelihood of success or a failure to demonstrate irreparable injury must necessarily result in the denial of a preliminary injunction." [5] *Arthur Treacher's*, 689 F.2d at 1143.

### A.

The district court found that there is a substantial likelihood of success by Instant on the merits. While paragraph EIGHTH of the agreement does appear at first glance to be a straightforward liquidated damages clause, there are a number of other paragraphs in the contract which belie this view.[6] Examining these other provisions of the contract, we find that the district court did not abuse its discretion in determining that there was a substantial likelihood of success by Instant on the merits.

*Injury Rule*, 57 Tex.L.Rev. 1065 (1979). It remains, however, the law of this circuit.

**6.** Paragraph THIRD, for instance, provides that Carrier shall employ the services of contractor for pickup and delivery of all shipments from carrier's customers, consignors and consignees in [certain areas of New Jersey], as defined in the tariffs of C.F. Air Freight, Inc., to and from carrier's terminals and/or airline terminals, as well as such other places and locations within the scope of the areas herein above described, as well as to and from the carrier's terminals wherever located in the State of New Jersey.

Paragraph FIFTH of the agreement provides that:

Carrier provides the contractor with the right of first refusal to perform any services required by the carrier within the scope of [certain areas of New Jersey], as defined by the carrier's tariffs and the Elizabeth, New Jersey, Terminal areas, including all other points and places, that are serviced from the C.F. Air Freight Elizabeth terminal.

Paragraph EIGHTEENTH provides: "Anything contained in preceding paragraphs notwithstanding carrier agrees to devote its best efforts in promoting business in the territory to be serviced by contractor as defined in paragraphs first, third, and fifth." Finally, paragraph TWENTIETH provides that "in the event of the breach of any term or provision contained in this agreement, the party adversely affected by such breach shall be entitled to pursue any and all legal and equitable remedies."

**B.**

■ In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the only way of protecting the plaintiff from harm. *See e.g., Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982); *Continental Group, Inc. v. Amoco Chemicals Corp.,* 614 F.2d 351, 356 and n. 9 (3d Cir. 1980).

Instant argues that without the preliminary injunction entered by the district court "Instant's business will be completely destroyed, its employees and jobs will be lost and its goodwill and business reputation will be ruined.... Instant will be forced to lay off most, if not all, of its 70 employees and will lose everything it has built over the past two decades."

The crucial issue in determining whether the district court abused its discretion in finding irreparable injury in this case is the question of whether money damages provide an adequate remedy at law to Instant. The Supreme Court, in speaking to the standards for granting preliminary injunctions, has noted:

> [I]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury.... 'The key word in this consideration is *irreparable.* Mere injuries, however substantial, in terms of money,

time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.' (emphasis in original).

*Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 953, 39 L.Ed.2d 166 (1964) (quoting *Virginia Petroleum Jobbers Assn. v. FPC,* 259 F.2d 921, 925 (D.C.Cir.1958)). As we stated in *Arthur Treacher's:* "[W]e have never upheld an injunction where the claimed injury constituted a loss of money or loss capable of recoupment in a proper action at law." *Id.* at 1145. In *Frank's GMC,* 847 F.2d 100 (3d Cir.1988) we found that "[t]he availability of adequate monetary damages belies a claim of irreparable injury." *Id.* at 102.

■ The bottom line in this case, as in *Frank's GMC,* centers on the loss of money which Instant will suffer as a result of the contract termination. Here the monetary damages which Instant alleges it is suffering are capable of ascertainment and award at final judgment if Instant prevails. These money damages will fully compensate Instant for its losses. *See Arthur Treacher's,* 689 F.2d at 1146. As we stated in *Morton v. Beyer,* 822 F.2d 364 (3d Cir. 1987), "although we are not insensitive to the financial distress suffered by [the plaintiff], we do not believe that loss of income alone constitutes irreparable harm."[7] In determining whether a remedy in damages

---

**7.** New Jersey courts have, on occasion, considered interference with the good will of a business as a factor to be considered in determining whether irreparable harm is being done to the plaintiff's business which seeks a preliminary injunction. *See Whitmyer Bros., Inc. v. Doyle,* 58 N.J. 25, 31, 274 A.2d 577 (1971) (fact that defendant had not interfered with goodwill of former employer's business found significant in denying employer's request for a preliminary injunction to enforce non-compete agreement.) Likewise, loss of some of the business of the plaintiff will be considered by New Jersey courts in deciding whether to grant or deny a preliminary injunction. *See Edison Electric Co., Inc. v. Edison Contracting Co.,* 203 N.J.Super. 50, 495 A.2d 905 (Ch.Div.1985).

We believe, however, that the Supreme Court of New Jersey would reach the same result as

we have on the irreparable injury issue. Under New Jersey law threat of immediate and irreparable harm is a necessary element which a plaintiff must establish before a preliminary injunction will issue. *Township of Montclair v. Hughey,* 108 N.J. 587, 531 A.2d 1359 (1987); *Crowe v. DeGioia,* 90 N.J. 126, 447 A.2d 173, 176 (1982). The question for New Jersey courts would be the same as the question we are faced with since the New Jersey Supreme Court has held that "[h]arm is generally considered irreparable in equity if it cannot be redressed adequately by monetary damages." *Id.* When the breach of contract is governed by a specific New Jersey statute (such as a franchise or anti-trust statute) the statute itself would determine the injunction standard.

for a breach of contract would be adequate the following circumstances are significant: "(a) the difficulty of proving damages with reasonable certainty, (b) the difficulty of procuring a suitable substitute performance by means of money awarded as damages, and (c) the likelihood that an award of damages could not be collected." *Restatement (Second) of Contracts* § 360 (1981).

Money damages in this case should be provable with reasonable certainty given the lengthy history of the two companies' association and the more than two years already performed under the contract. Any damage to Instant is susceptible of precise measurement in light of the volume of freight Instant has handled for C.F. over the period of the contract. If C.F. in fact provides eighty percent of Instant's business, as Instant maintains, the calculation of the damage to Instant which results from the breach of the last two years of the contract would seem to admit of a ready mathematical computation. Suitable substitute performance by means of money awarded as damages can compensate Instant fully for its lost profits and other injuries it may prove. There is certainly no question that an award of damages would be collectable. C.F., as Instant has emphasized, is a corporation with annual revenues of more than one billion dollars. Thus, in considering significant factors to be weighed in deciding whether damages at law are adequate in the case of a breach of contract, we conclude that each factor points to the adequacy of money damages.

■ The only question which remains then, is whether, despite the adequacy of money damages there, nonetheless, is irreparable injury since Instant may no longer be in existence to collect any money damages it is awarded. The district court's determination that Instant will be forced to shut down is not supported by any financial statements or projections in the record indicating that Instant will be forced into bankruptcy. Instant still maintains twenty percent of its business. It is entirely free and always has been free to secure other business. The contract with C.F. will terminate

in less than nineteen months in any case. We therefore conclude that the district court abused its discretion in finding Instant likely to cease its existence and thereby suffer irreparable injury.

In *Morton* we found that there was a likelihood of success on the merits in the case of a government employee terminated without pay. However, we concluded that there was no irreparable harm present despite the fact that the employee in question was "someone who lives, in effect, on his salary." The district court had determined that deprivation of that salary would be "economically irreparable and c[ould] not be cured by giving the money back at a subsequent date." 822 F.2d at 372.

In *Frank's GMC* we noted that loss of the market segment in question there amounting to some twenty-six percent of Frank's GMC's profits, "does not place its continued business survival in serious jeopardy." *Id.* at 102, n. 4.

In *Arthur Treacher's*, which we believe controls the instant case, Arthur Treacher's sought a preliminary injunction which would require one of its franchisees to pay $200,000 in past due and current royalties before trial. The district court concluded that Arthur Treacher's would be irreparably harmed without such relief. The district court reasoned:

All parties agree that the royalties are the "lifeblood of a franchise system." Without these royalties, Arthur Treacher's cannot exist. It has been represented to the court that the company is on the verge of bankruptcy ... The court finds that continued non-payment of royalties pending litigation will inescapably result in the destruction of Arthur Treacher's and this without more, warrants a finding of irreparable harm pendente lite absent the mandatory injunction. If Arthur Treacher's ultimately prevails at trial, any award of money damages could hardly compensate if it is bankrupt and without a franchise system which took years to develop.

*Id.* at 1141 (quoting district court). We found that the district court had erred as a matter of law in finding irreparable injury

for two reasons. First, the individual franchisee in that case could not, in and of itself, cause Arthur Treacher's bankruptcy. Second, "the record which consists primarily of *general statements* pertaining to the refusal of *all franchisees* to pay royalties is *insufficient in any event* to support a finding that Arthur Treacher's was on the verge of bankruptcy, let alone that it was suffering irreparable injury from A and B's individual action." *Id.* at 1146 (emphasis added). In the instant case we likewise have no clear factual record apart from general statements to the effect that Instant will no longer exist as a result of the termination. As in *Arthur Treacher's* we find these insufficient to demonstrate irreparable harm.

## C.

If this were a case where the public interest was directly affected, our consideration might be different. As the Supreme Court has observed, "parts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Virginian Ry. Co. v. System Fed'n No. 40,* 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937). This is especially the case where the public interest in question has been formalized in a statute. *See Government of Virgin Islands, Dept. of Conservation and Cultural Affairs v. Virgin Islands Paving,* 714 F.2d 283, 286 (3d Cir.1983). We have previously held that a statutory provision authorizing preliminary injunctive relief upon a showing of probable cause to believe that the statute is being violated may be considered a substitute for a finding of irreparable harm for purposes of a preliminary injunction issued under Rule 65. *See Id.* at 286.

With regard to the public interest analysis Instant has not cited to us nor have we located any New Jersey statute concerning the regulation of business dislocations which might indicate a determination by the New Jersey legislature of a public policy which C.F. has violated.

Nor is there any allegation of a federal antitrust violation which would provide a public interest rationale for an injunction. In *Bateman v. Ford Motor Co.,* 302 F.2d 63, 66 (3d Cir.1962), we noted that "A judgment for damages acquired years after his franchise has been taken away and his business obliterated is small compensation to one, who as here, has had a Ford franchise since 1933." *Id.* at 66. *See also Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2d Cir.1970) ("The right to continue the business in which William Semmes has engaged for 20 years and into which his son had recently entered in not measurable entirely in monetary terms; the Semmes want to sell automobiles, not to live on the income from a damage award."). *Bateman,* however, involved a preliminary injunction granted in the context of an alleged antitrust violation. An antitrust violation was also at the center of *Bergen Drug Co. v. Parke Davis & Company,* 307 F.2d 725 (3d Cir.1962), also cited by Instant. The concern in both these cases was to maintain the status quo while the antitrust litigation was pursued. In the case before us no such antitrust violation has been asserted.

## III.

In *Systems Operations Inc. v. Scientific Games Dev. Corp.,* 555 F.2d 1131 (3d Cir. 1977) we found that a district court commits reversible error when it fails to require the posting of a bond by the successful applicant for a preliminary injunction.[8]

---

**8.** In *Systems Operations* we did not consider whether a court may dispense with the posting of a bond in a case where the injunction raises no risk of monetary harm to the defendant. This factor is also not present in the case before us. Clearly C.F. may suffer monetary loss if forced to keep the terminal open.

Other courts of appeal have held that certain non-commercial and public interest cases may

require dispensing with the bond. *See Crowley v. Local No. 82,* 679 F.2d 978 (1st Cir.1982) *rev'd on other grounds* 467 U.S. 526, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984) (district court acted within its discretion in not requiring bond where plaintiffs were not able to afford security and a bond requirement would affect enforcement of Title I rights adversely); *Wayne Chemical, Inc. v. Columbus Agency Service Corp.,* 567 F.2d 692 (7th

*Id.* at 1145. *See also Frank's GMC,* 847 F.2d at 103.

In response to C.F.'s request for a one million dollar bond, counsel for Instant argued to the district court:

> The defendant is a multi-billion dollar company.
>
> . . . .
>
> Could my client put up a million dollars? I really don't know that this company has that kind of security to furnish to a surety company in order to permit the surety company to write the bond. A quarter of a million dollars is a lot of money. If we had that, yes, we would have the wherewithal to put up a very large bond, and that is a tremendous premium to pay. That the defendant has it, and let the defendant continue to sit were [sic] that money.

It is true that a bond may create a barrier to the granting of a preliminary injunction. The barrier fulfills one of the purposes of the bond requirement.

> Requiring plaintiff to post a bond departs from the usual American approach of keeping the cost of litigation down to encourage people to resort to courts. The bond grows out of the idea that because of attenuated procedure, an interlocutory order has a higher than usual chance of being wrong. Bonds are common for pre-judgment remedies like attachment, garnishment and replevin. The bond deters rash applications for interlocutory orders; the bond premium and the chance of liability on it causes plaintiff to think carefully beforehand. An incorrect interlocutory order may harm defendant and a bond provides a fund to use to compensate incorrectly enjoined defendants.

Cir.1977) (in action to recover insurance benefits, district court properly excused bond upon plaintiffs' showing of indigency where court determined that indigency was circumstance justifying excuse); *see also* O. Fiss and D. Rendleman, *Injunctions* 388–89 (1984); Note, *Recovery for Wrongful Interlocutory Injunctions Under Rule 65(c),* 99 Harv.L.Rev. 828 (1986) (arguing that waiver of the bond requirement is appropriate only when the plaintiff is indigent or is suing in the public interest).

O. Fiss and D. Rendleman, *Injunctions* 383 (1984).

■ Rule 65.1 of the Federal Rules of Civil Procedure requires that security given pursuant to Rule 65 be

> given in the form of a bond or stipulation or other undertaking with one or more sureties, each surety submits to the jurisdiction of the court and irrevocably appoints the clerk of the court as the sureties agent upon whom any papers affecting the sureties liability on the bond or undertaking may be served. The sureties liability may be enforced on motion without the necessity of an independent action.

These requirements were not met in the arrangement approved by the district court pursuant to which C.F. would maintain in its possession the $220,000 of liquidated damages which it acknowledged was owed to Instant.

It is generally settled that, with rare exceptions, a defendant wrongfully enjoined has recourse only against the bond. As the Supreme Court has stated "A party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond." *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Corp. Linoleum and Plastic Workers,* 461 U.S. 757, 770 n. 14, 103 S.Ct. 2177, 2185 n. 14, 76 L.Ed.2d 298 (1983). *See also Adolf Coors Co. v. A & S Wholesalers Inc.,* 561 F.2d 807 (10th Cir.1977); *Buddy Systems Inc. v. Exer–Genie, Inc.,* 545 F.2d 1164 (9th Cir. 1976), *cert. denied,* 431 U.S. 903, 97 S.Ct. 1694, 52 L.Ed.2d 387 (1977). Where a bond is denied, as it was in the case before us, the party against whom the injunction issues is limited in seeking a remedy if they win on the merits.[9] Furthermore, the bond

9. We have previously held, in a case specifically limited to labor disputes, that a plaintiff's liability "shall be fixed ... without regard to any limitation in an injunction." *United States Steel Corp. v. United Mine Workers,* 456 F.2d 483, 494, 456 F.2d 483 (3d Cir.), *cert. denied* 408 U.S. 923, 92 S.Ct. 2492, 33 L.Ed.2d 334 (1972). In that case we observed that at that time "[n]o Supreme Court authority which has been called to our attention holds that the liability of a plaintiff who has been improperly granted an injunc-

serves to inform the plaintiff of the price they can expect to pay if the injunction was wrongfully issued.

We need not determine whether a remand on the bond issue requiring the district court to impose a bond would cure the bond problem in this case since we have independently found that the irreparable harm necessary for the grant of the injunction was lacking.

### IV.

We conclude that Instant did not meet its affirmative burden of showing irreparable injury. Therefore, the district court improvidently granted the preliminary injunction. Furthermore, the district court erred in issuing the preliminary injunction without requiring Instant to post a bond. For the foregoing reasons, we will reverse and remand with instructions to vacate the preliminary injunction.

SEITZ, Circuit Judge, dissenting.

My essential difference with the majority is based on my view that the district court did not abuse its discretion in finding irreparable harm on this record.

On this appeal from an order granting a preliminary injunction, the first critical issue to be addressed here, as the majority notes, is whether Instant showed a reasonable probability of ultimate success on the merits of the legal issue presented.

It is certainly reasonable to interpret Article Eighth to mean that the Agreement would not necessarily terminate with the closing of the terminal. That reading is necessarily implied in the very language of Article Eighth. Since other provisions of

the agreement and evidence of record can be read to support a conclusion that the closing would not terminate the agreement, I agree with the majority that the "probability of success" requirement was met.

If Article Eighth is inapplicable and there was a breach of other provisions of the contract, it must then be determined whether Instant has an adequate remedy at law for damages or whether it has shown irreparable harm cognizable in equity. *See Fleischer v. James Drug Stores*, 1 N.J. 138, 62 A.2d 383 (1948); *First National State Bank v. Commonwealth Federal Savings and Loan Ass'n*, 610 F.2d 164 (3d Cir.1979) (applying New Jersey law).

It is at this point that I part company with the majority. The majority states that Instant failed to make a showing of irreparable harm and thus limits plaintiff's relief to damages. The district court found to the contrary and I believe its conclusion is supported by this record.

In an unchallenged affidavit of Instant's president, it is stated:

15. The transportation and related services provided by Instant to CFAF pursuant to the Agreement accounts for approximately 80% of Instant's entire business. In order to service the needs of CFAF under the Agreement, Instant employs approximately 70 workers, including 64 current full-time employees and more than 100 employees during the Christmas season. The great majority of Instant's employees are skilled drivers, warehouseman and cargo handlers with many years of experience in the air freight industry. Instant's employees work six days per week, 24 hours per day in three overlapping 10-hour shifts,

tion is limited to the amount of the bond." *Id.* at 492. The Supreme Court's decision in *W.R. Grace*, quoted above, now provides authority for the proposition that liability can be based only upon a posted bond.

We are mindful of the fact that, as St. Germain wrote in the 16th century, it was the "intent [of] equytie ... to temper and mitigate the rigour of the law." C. St. Germain, *Dialogues Between a Doctor of Divinity and a Student in the Laws of England* 45 (W. Muchall 18th ed. 1792) (quoted in Shreve, *Federal Injunctions and the Public Interest*, 51 George Wash.L.

Rev. 382, 385 n. 14 (1983)). However, there are important policies undergirding a strict application of the bond requirement in most injunction granting contexts. As one commentator has noted, "[t]he rule limiting liability to the amount of the bond provides the plaintiff with notice of the maximum extent of her liability. The bond can thus be seen as a contract in which the court and plaintiff 'agree' to the bond amount as the 'price' of a wrongful injunction." Note, *Recovery for Wrongful Interlocutory Injunctions Under Rule 65(c)*, 99 Harv.L.Rev. 828, 833 (1986).

in order to effectuate the transport of approximately 60,000 pounds of CFAF cargo per night, including emergency medical supplies and equipment. Instant owns and operates approximately 44 trucks and vans, as well as trailers, including recently acquired vehicles at substantial cost and purchased to service CFAF's needs under the Agreement.

16. With approximately two years remaining to the term of the Agreement, and millions in revenues anticipated to be received from CFAF during that time, the loss of CFAF's business would effectively destroy Instant and wreak havoc upon Instant's employees and their families. Notwithstanding the express obligations of CFAF under the Agreement, including Instant's right of first refusal, CFAF is attempting to terminate the Agreement by transferring all its business into the Emery system, thereby effectively putting Instant out of business virtually overnight.

The quoted historic facts and the reasonable inference to be drawn therefrom were relied on by the district court. They can only be overturned if they are clearly erroneous. F.R.Civ.P. 52(a). Since no countervailing facts were offered by defendant, Air Freight, I certainly am not left with the definite and firm conviction that a mistake was committed by the district court. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Nor, to the extent the finding of irreparable harm implicates a question of law based on the facts, do I find any error.

I therefore believe that the district court did not abuse its discretion in concluding that injunctive relief was warranted. Several provisions of the agreement quoted by the majority fully permit the conclusion that Instant was entitled to receive the agreed portions of Air Freight's business regardless of the closing of the terminal. Certainly that is the understanding of Article Eighth of the agreement expressed in the affidavit of Instant's President. Furthermore, Instant might well be able to look to other sources to try to save its business if reasonable time is available to permit it to carry on its enterprise elsewhere. On this record the district court was justified in concluding that money damages are not an adequate measurement of the potential loss of good will.

Finally, I address the majority's alternative holding that the district court committed error when it failed to require the plaintiff to provide the appropriate security under Fed.R.Civ.P. 65(c). I agree with this conclusion insofar as it goes. The majority went on to note that it need not decide whether a remand would be appropriate in this case because it determined that the irreparable harm necessary for the grant of the preliminary injunction was lacking.

Since I find no legal infirmity with the preliminary injunction, I would reach the issue set aside by the majority and remand this case to the district court. The purpose of the remand would be to permit the district court to conduct an appropriate adversary hearing to determine what security should be fixed in light of the established requirements of Fed.R.Civ.P. 65(c).